## THE PEOPLE OF THE STATE OF NEW YORK, DEFEND-ANTS IN ERROR, *v.* HENRY MYERS, PLAINTIFF IN ERROR.

*Court of Sessions — Removal of indictments from, to Oyer and Terminer — entry of order for — Burglary — what circumstantial evidence admissible to prove it when it may be made — Caption — no part of indictment.*

Under the statute declaring that the Court of Oyer and Terminer and jail deliv-
ery shall have power to try all indictments found in the Court of Sessions of
the same county, which shall have been sent by order of such Court of Ses-
sions to, and received by, the Court of Oyer and Terminer, the Court of Ses-
sions directed, after the prisoner had been arraigned (December, 1873) and
pleaded not guilty, that the indictment be sent to the Court of Oyer and Ter-
miner for trial. The clerk then entered on the minutes, "the defendant was
arraigned before the court, and by his attorney, E. P. Hart, pleaded not guilty
— Remanded." Subsequently, and at the opening of the trial of the prisoner
in the court of Oyer and Terminer (February 11, 1874), the clerk entered on the
minutes of the Court of Sessions, where a blank had been left for that purpose,
"Ordered, that the trial of this indictment go over to the next Court of Oyer
and Terminer." *Held,* that it was not necessary to its validity that the order
of the Court of Sessions should have been actually entered during its session,
as no substantial right was involved, the entry being a mere ministerial duty.
The indorsement on an indictment may constitute part of the records of the court.
The caption of an indictment forms no part of it, and it may be affixed by the clerk
at any time.
The kind of circumstantial evidence which may be received, as tending to prove
the commission of the crime of burglary, considered.

THE prisoner was indicted in the Court of Sessions of Chemung
county, for burglary in the third degree, December, 1873. He was

---

*1 Greenl. E., §§ 20, 21; 14 Mass., 257; 10 John., 475; 4 Wend., 543; 38 N.Y.,
264; Cow. & Hill's Notes, notes 311, 882.

arraigned on the indictment before that court, on the twenty-sixth of that month, and pleaded not guilty; thereupon, the court sent the indictment to the Court of Oyer and Terminer for trial, and such direction was evidenced by an entry then made on the indictment, as follows: " Trial of indictment to go over to next Court of Oyer and Terminer." In the minutes of the court kept by the clerk, in which he entered the proceedings generally, the entry was made as follows: " The defendant was arraigned before the court, and by his attorney, E. P. Hart, plead not guilty.—Remanded." Subsequently, and at the opening of the trial of the prisoner, in the Court of Oyer and Terminer, February 11th, 1874, the clerk made the further or perfected entry in his rough minutes, kept by him of the proceedings of the Court of Sessions, where a blank had been left for the purpose, as follows: " Ordered, that the trial of this indictment go over to the next Court of Oyer and Terminer." The clerk, who was called by the prisoner's counsel and sworn, testified as to these entries, and, among other things, stated that the blank was filled, as above stated, in accordance with the direction of the Court of Sessions. The prisoner's counsel interposed the objection that the Court of Oyer and Terminer had no jurisdiction to try the prisoner, on the ground that the indictment had not been duly sent by order of the Court of Sessions to the Court of Oyer and Terminer, but remained in the Court of Sessions. The court overruled the objection, and ruled and decided that the indictment was properly in the Court of Oyer and Terminer, and that the latter court had jurisdiction to try the prisoner thereon; to which ruling and decision, the prisoner, by his counsel, duly excepted.

The prisoner's counsel then objected to the trial of the indictment, upon the ground that there was no caption thereto, and that the indictment, without such caption, was incomplete as a record from the sessions to the Oyer and Terminer.

Pending the making of the motion, and while the same was being argued before the court by the prisoner's counsel, the clerk reaffixed a caption to the indictment, the same having been previously affixed by him and removed by the counsel. The court thereupon overruled the objection; to which ruling the counsel for the prisoner duly excepted. A jury was thereupon empaneled and sworn, when the prisoner's counsel raised objections to the

giving of proof under the several counts of the indictment, on the ground stated by him, unnecessary to be detailed, as no ground of error is charged or alleged to the ruling of the court in that regard.

The people then gave testimony before the court and jury showing, or tending to show, that the Second National Bank of Elmira was a banking corporation, duly organized under the general banking law of the United States. That its banking office was situate in the city of Elmira. That the vault of said bank was in said banking room, and was eight feet in height, the top being of iron plates; upon this were placed iron bars, and then solid stone masonry to the room above. The room above the bank and over the vault and masonry, was occupied by the Young Men's Christian Association. There were two safes in the vault, and there were deposited in said safes, money and securities to the amount of over half a million of dollars. That about eight o'clock in the evening of December the 5th, 1873, an excavation was found to have been made in the said masonry, from the floor of the room of the Young Men's Christian Association room to the said bars of iron, the hole being large enough to hold two or three men. That in the cavity made from the floor above into the room below, in which was the vault of said bank, there were left by said burglars, burglars' tools.

*The counsel for the people produced the tools so found, and offered to exhibit the same to the jury for inspection,* which was done.

The counsel for the people further gave testimony showing, or tending to show, that between twelve and one o'clock in the day time of the sixth of December aforesaid, some tools were found in a lumber yard, near the Chemung canal in Elmira aforesaid, some rods distant from the house which the prisoner had occupied. That said tools were wrapped up in two newspapers, one the New York Herald of date December third, and the other the New York Herald of December 5, 1873. And the prosecution introduced evidence tending to show that said tools wrapped up in said papers, came from the prisoner's house, and were brought to where they were found, and there concealed by one of the prisoner's confederates, living with him in said house or by himself, the night

previous, shortly after the discovery of the burglary, and were, in fact, part of the same kit or set of burglars' tools found in the cavity over the bank (each of which would be incomplete without the other), and that said piece of Elmira Gazette found wrapped up inside was part of a paper, another portion of which was found in the prisoner's house.

*The counsel for the people then offered in evidence two newspapers, viz.: The New York Heralds.*

*The counsel for the people further offered in evidence the said piece of the Elmira Gazette, which was a portion of the paper issued on the 5th day of December, 1873, and bearing such date, clipped with a pair of shears in a circular form.*

*The counsel for the people then produced said tools so found on Saturday, and proposed that the said jury examine and inspect the same, which was done.*

The counsel for the people then gave testimony showing, or tending to show, that in the forenoon of the sixth day of December last, two satchels were found near the canal in said city of Elmira, some distance from the house the prisoner had occupied, containing tools of various kinds and descriptions, and the prosecution also introduced evidence tending to show that said satchels containing said tools, were found in the immediate vicinity where there were also found said burglars' tools wrapped up in said New York Herald, and were a part of the same set and kit of burglars' tools found in said newspapers, the other parts of which were found in said cavity over said bank safe. That they were brought from the prisoner's house and there concealed by the prisoner or one of his confederates living with him in his said house, after the discovery of said burglary, on the night of December fifth.

*The counsel for the people then produced said tools and proposed that the jury examine and inspect them, which was done.*

At the house occupied by the prisoner before his arrest, there were found two or three coats, two or three hats and caps, and a pair of overshoes. Evidence was introduced tending to show that said coats, caps, shoes, as well as gloves, had been worn, and that they bore evidence of being stained with dry mortar and lime.

*The counsel for the people produced these articles, and proposed that the jury should examine and inspect them, which was done.*

That there were picked up from the kitchen floor of the house occupied by the prisoner before his arrest, a piece of newspaper, or pieces thereof, called the Elmira Gazette, of date December 5, 1873, which pieces of paper laid in public view to any person entering the room when the same were picked up. That said piece of paper was clipped in a circular form with a pair of shears, corresponding in all respects with the piece of the Elmira Gazette of the same date, wrapped up in the tools found in the said lumber yard. It was claimed that this was a part of the paper of which a piece was found in the tools as aforesaid. *The counsel for the people then offered these pieces of newspaper in evidence.*

That among certain articles purchased from the house of the prisoner, January 8th, 1874, was a flat-iron then being in the kitchen of said house. That there was a slit or cut in or across said iron, having the appearance of being freshly made ; and the prosecution also introduced proof, tending to show that such cut was made by one of the steel saws which were found in one of the satchels of tools found in the lumber yard near the house, constituting a part of the same kit of burglars' tools.

*The counsel for the people then produced said flat-iron, and a saw alleged to have been found in the aforesaid satchels, and proposed to exhibit said iron and saw to said jury, for them to examine and inspect, and determine by such inspection whether the said saw would fit in said cut or slit,* which was done.

The counsel for the people further gave evidence showing, or tending to show, that on the ninth day of December aforesaid, an air-pump was found in the aforesaid lumber yard, about twelve or fourteen feet distant from where the said tools were found in a newspaper on the sixth day of December. And the prosecution also introduced evidence tending to show that said air-pump and certain appendages of rubber tubing connected thereto, were part of the same apparatus and tools found as aforesaid with said burglars' tools, and that the same were applicable to the use of exhausting the air and inserting powder into safes with the use of putty, for the purpose of bursting them with gunpowder, and that the same were hidden where they were found, on the night of December fifth, after the discovery of said burglary, *and produced said*

*pump and papers to exhibit the same to the witness in the presence of the jury,* which was done.

The counsel for the people also introduced evidence showing, or tending to show, that the prisoner and several confederates, during the time consumed in making the excavation over the said bank vault and committing said burglary, covering a period of time from November 10th to December 5th, 1873, occupied a house, rented by the prisoner in Elmira, November 10, 1873, as a place of rendezvous, where they remained concealed during the day, and that they boarded and slept in said house; and, as evidence tending to establish said fact, the people gave evidence showing the quantity of groceries purchased by the prisoner for the inmates of said house.

*The counsel for the people offered to prove the quantity of groceries purchased by the prisoner of grocers, and the quantity of meat and of bread bought by him from time to time during the period the prisoner occupied said house.*

*The counsel for the people then offered to show that the persons, of whom the prisoner purchased these articles, offered to send them to his house, but the prisoner declined the offer, and took them himself.*

*The counsel for the people introduced evidence showing or tending to show that the prisoner was, at different times of the day between November 10th and December 5th,* 1873, *lounging around the places of business adjacent to the said bank building, and from said point of observation could watch the movements of the officers of said bank, and be informed if any discovery of said burglary should be made.*

After all the evidence on the subject of the tools found over the vault, as well as those found in the lumber yard near the defendant's house, and the articles found in said defendant's house, had been given for the purpose of connecting them as forming one set and kit of tools, the court, at the instance of the people's counsel, permitted the jury, under the objection of the prisoner's counsel that the same was incompetent and improper, to inspect the flat-iron and gloves, and compare the same; and also, under a like objection, permitted the jury, at the instance of the people's counsel, to compare some twine, found in said vault, with some twine found in the prisoner's house some time after his arrest.

*The people then gave evidence showing or tending to show that the prisoner was confined in the jail of the county of Chemung, and that he occupied a cell with two other inmates, and then showed that in the month of January last the prisoner escaped from said jail with others.*

The court then charged the jury as follows:

*Gentlemen of the Jury*—The prisoner at the bar, Henry Myers, is arraigned before you on the charge of having committed a criminal offense, which is known and recognized in law as the crime of burglary in the third degree. The indictment alleges that on the 4th day of December, 1873, the prisoner broke and entered a portion of the building on the corner of Lake and Carroll streets, in the city of Elmira, occupied by the Second National Bank on the first floor, and also another portion of the same building on the second floor, immediately over the bank, with intent to steal certain personal property therein used or deposited, or to commit a felony.

It appears from the evidence that Mr. Pratt, the president of the bank, having occasion to go in the vault for some purpose, about eight o'clock in the evening of the fifth day of December, discovered a considerable quantity of dust on the floor, which attracted his attention. He immediately went up stairs into the association rooms, but finding them occupied at the time by a large number of people, returned to the bank and remained there and about the street in that vicinity, until the rooms of the association had been vacated.

He then, in the presence and with the assistance of one or two others, who have been examined as witnesses, removed a portion of the carpet and floor of the center room occupied by the association, and discovered that a large excavation had been made beneath the floor immediately over the vault of the bank. This cavity was five or six feet in length, and about three feet in width, and had been drilled and excavated down several feet below the surface of the floor, not only through the original wall or partition of brick and mortar, but also through, or nearly through, the solid mass of rock below, which had been securely fastened or imbedded there as a protection against midnight attack from the thieves and burglars who infest and endanger society.

In this excavation were found a large number of implements and

tools, exceedingly well adapted to the use in which they had evidently been employed; and also a pair of gloves and overalls, which had doubtless been worn by the burglar while engaged in his arduous service.

There were notes, bonds and moneys on deposit at the time in the iron safe within the vault, worth about half a million of dollars, and other articles of property within the vault, but outside of the safe of the vault, of the value of three or four hundred dollars; and there was property kept for use in the rooms of the association above.

The prisoner had come to Elmira an entire stranger, early in the month of November, and hired a house on the corner of Third and Baldwin streets, for which he paid in advance the sum of twenty dollars, the rent of a single month, and which he occupied until he was arrested on the charge of having committed this crime.

From about the time of his arrival in the city, he was frequently seen near and about the premises in question, and was a daily visitor in the reading-room of the Young Men's Christian Association. He had been there during the evening of the fifth of December, and was observed at the main entrance near the foot of the stairway in front of the building, immediately after the discovery of the excavation, where he was finally taken into custody and committed to prison. An examination of the house in which he had remained since his arrival here, and a lumber yard near by, was made a day or two afterward, which resulted in the discovery in and about the lumber yard of other tools, of the same manufacture, and similar in design to those found in the excavation over the vault of the bank.

Now it is claimed on behalf of the prosecution with great earnestness and confidence, that these leading facts, taken in connection with other minor facts and circumstances, which it is insisted have been proven before you, clearly sustain the charge contained in the indictment, and establish the guilt of the prisoner. And it is claimed with the same earnestness and confidence for the defense, that the evidence utterly fails to connect the defendant with the commission of the crime, or at least is too indefinite, uncertain and doubtful in its application, to warrant a verdict against him as the criminal. Before considering the evidence more

in detail, let me call your attention, gentlemen, to the law of the case.

Under our statute, any person who shall break and enter in the day or night time, any shop, store, booth, tent, warehouse or other building, in which any goods, merchandise, or valuable thing shall be kept for sale, use or deposit, with intent to steal therein, or to commit a felony, is guilty of burglary in the third degree. You will observe that there are several necessary and essential elements or ingredients of this offense, all of which must be proven by the prosecution before the defendant can be properly convicted. The time when the offense was committed is entirely immaterial, as it may be, in the language of the statute, " in the day time or in the night time," but to constitute the offense, the prosecution must establish four points or facts against the prisoner:

1st. An actual breaking into the building. This is effected by any substantial and forcible irruption or violence of the mode of security, or the unloosening of any fastening which the owner has provided for the protection of his building or inclosure. The mere raising of a window, or taking out a pane of glass, picking a lock, or opening it with a key, or even lifting a latch of a door, are sufficient; and they are familiar illustrations of the rule, and of the amount of force requisite to constitute this branch of the offense.

2d. There must be a forcible entrance through an aperture thus created. But it has been held that there is a sufficient entry when any part of the body, hand or foot, or even any instrument or weapon used in effecting the breach, has been actually introduced into the building through an aperture large enough to have admitted the person of the culprit, and enabled him with a proper opportunity to have effected his object.

3d. The building thus broken and entered must have contained at the time, goods or merchandise, or some valuable thing, kept for sale, use or deposit. There can be no question on this point under the evidence in this case, as there was, in the rooms of the bank or of the association, sufficient property kept for use or deposit, within the meaning of this statute. But I desire under this head to call your attention to the meaning of the word " building," as used in the statute. Although the rooms occupied by the bank on the first floor, were in the same block and under one roof,

the bank occupying as owner, and the association under a lease, they were, in contemplation of law, separate buildings. Whenever a building is severed by leasing distinct portions of it to different persons as occupants, each of such persons is entitled to all the privileges of, and it must be regarded as, a separate building within the meaning of the statute; so that it is proper to allege that the room occupied by the association, and the room occupied by the bank, was the building of the bank, and if either of these rooms or buildings has been broken and entered, it is sufficient in this branch of the case.

4th. The burglary must be committed with intent to steal in the building, or to commit some felony. *It is not necessary, gentlemen, as claimed for the defense, that if the intent be to steal, the prosecution must show an intention to steal enough to amount to grand larceny. It is sufficient for all the purposes of this case, if the intention was to steal any amount whatever, or property of any value whatever, or, in the language of the statute, " any valuable thing."*

This intention is usually shown by the circumstances in the case as developed by the evidence.

The breaking and entering in the night time with so much effort and pains, and with such elaborate preparations and means, after the entry was effected, to force open the safe, in which there was every reason to believe a large amount of money and valuable property was contained—if you shall find these facts established by the evidence—raise a presumption that the acts were committed with the intention of stealing.

You have a right to infer the motive or intent from the acts done, and all the circumstances given in evidence, and if you are satisfied from such facts and circumstances that the intention was to steal or commit any felony, you will be warranted in finding the fact accordingly.

*Now let us apply these legal principles more particularly to this case. It is claimed on behalf of the prosecution, that the defendant is guilty under this indictment; if you shall find that he broke and entered the rooms or building of the Young Men's Christian Association with intent to commit a felony—that is, with intent to dig down through the floor of the association rooms into the bank*

*below with intent to steal in the bank—and speaking for the court, gentlemen, I charge you that this claim is well founded, and is a correct exposition of the statute. I think it may be safely assumed upon the evidence, that the person or persons who broke and entered into the association rooms, and made the excavation under the floor, down, or nearly down, to the vault of the bank, had no intention of stealing from the rooms of the association, but that his or their object was to break down through and enter into the bank below, with the intention of stealing there, if anywhere. Hence you could not find that the breaking and entering were effected into the association rooms, with intent to steal from those rooms, but should find that they were done, if at all, with intent to commit a felony, as it would be a felony for the party thus breaking or entering into the association rooms, to dig down while there through the floor and enter into the bank below, with intent to steal from the bank. Therefore, gentlemen, if you find that the defendant broke and entered into the association rooms, with the intention of then digging down, breaking into, and entering the vault of the bank below, with intent to steal from the bank, even though he failed in breaking through or effecting an entrance into the vault of the bank, he is guilty of burglary in the third degree, and you can properly convict him under the third count in the indictment.*

Again, it is claimed by the prosecution, that if you shall find the defendant, after effecting an entrance into the association rooms, broke through the floor and entered below into the room containing the vault of the bank, with intent to steal therefrom, then he is guilty of burglary in the third degree; and this, also, in the opinion of the court, is a correct statement of the law. But in this connection it is proper to call your attention to the evidence bearing on this branch of the case. You will recollect the testimony of Mr. Pratt, relating to the safe and vault, and room in which the vault is contained, as well as the nature and extent of the excavation above. You will recollect his description of the size of the room, as the building was originally completed; of the iron and stone, or solid masonry, which were added to that portion of the wall immediately over the vault, and also the space of several inches, or air-chamber, left above on the sides, between the vault and the walls of the room as thus repaired

Now it is not claimed that an entrance was effected into this iron vault itself, inclosing the safe in which the money was contained, but it is insisted for the prosecution, and denied on behalf of the defense, that the excavation was made from above down to the iron rails which supported the stone, brick and mortar that had been added to the original wall or partition separating the association rooms above from the bank below, and these iron rails, at one end, had been forcibly moved about one foot apart, and that an aperture was thus created clear through, not only the original wall but also through the additional brick and stone and the iron rails into the air-chamber between the sides and top of the walls of the room and the iron vault, as described by the witness; and, therefore, that the room or building of the bank had been broken through and entered, within the meaning of the statute. This is a question of fact for you to determine. The court cannot assent, however, to the doctrine claimed by the prosecution, that there was a sufficient breaking and entering into the bank to constitute the offense, when the excavation was made through the original thickness of the wall or partition separating the association rooms from the rooms of the bank. We think, the subsequent addition of iron and stone masonry, became and must be regarded as a permanent portion of the wall, through which it was necessary to penetrate before the breaking and entry can be said to have been accomplished. *But, gentlemen, if you are satisfied, from the evidence, that the defendant did excavate and force an aperture and entrance down into the vacant space or air-chamber next to the inner vault, with intent to steal or commit any felony, even though he was then prevented by this new obstacle from effecting his object, he is guilty of burglary in the third degree, and you would be warranted in rendering a verdict against him under the indictment.*

It is not necessary that this excavation and entry should have all been done on a single occasion, or that the breaking and entry should have been made at the same time. If it required days and weeks to remove the obstructions, make the excavation and effect the entrance, the offense was complete when the result was finally attained, and the crime was committed when the aperture was finally made through all the obstructions, and the entrance effected. Nor is it necessary, if there were others aiding and abetting the

defendant in the commission of the crime, that he himself should have made the excavation, or have broken or entered either into the association rooms or into the room of the bank below.    When several persons unite in a common purpose and design to commit a burglary, and each has a different part assigned to him in the execution of the plan, as, that one shall break and enter the building and steal the property, while the others remain on guard outside to prevent surprise, or to give alarm on the approach of danger, the breaking and entering by one is made the act of all the party engaged in the transaction ; they are all legally present and participating in the commission of the offense, and they may all be convicted as principals in the crime.

But, gentlemen, the principal question of fact in the case which you will have to determine, is whether the defendant had any personal connection with this transaction — whether he himself committed this crime, or was one of a party banded together for the purpose of breaking into and stealing the contents of the iron safe in this bank, and any one or more of the party of which he was a member, actually broke and entered into the rooms of the association or of the bank, or both, in partial execution of the common design.

No evidence has been produced from eye witnesses, to identify and fasten upon the defendant a positive personal connection with the "hole in the wall" over the vault of the bank, nor could such evidence be expected, unless the culprits were caught in the very act of committing the offense; but it is claimed for the prosecution, that they have nevertheless established this fact beyond all reasonable doubt, by the only evidence by which in ordinary cases of this character it is susceptible of proof, by a net-work of evidentiary facts and circumstances antecedent to and surrounding the principal transaction, which point with a necessary and almost unerring moral certainty to the defendant as the criminal ; and this brings us to a brief consideration of the nature and value of circumstantial evidence.    Now, whether a case is proved by direct or positive evidence, or by indirect or circumstantial evidence, in either event the facts given in evidence from which the jury are to draw their ultimate conclusions, are proved by positive testimony of witnesses ; *but in the latter case the jury are required to compare*

*and arrange and analyze in their minds the incidental or eviden-*
*tiary facts, thus proven by the witnesses, in the light of their own*
*knowledge and experience of human events, and to draw such*
*inferences or conclusions as are natural or necessary from their*
*usual and actual inter-relation and correspondence, as ascertained*
*from such personal knowledge and experience.* It has been said by
a great authority on this subject, "that in the actual occurrences of
human life nothing is inconsistent." Every event which actually
transpires has its appropriate relation and place in the vast com-
plication of circumstances of which the affairs of men consist; it
owes its origin to those which have preceded it; it is intimately
connected with all others which occur at the same time and place
and often with those of remote regions, and in its turn it gives
birth to a thousand others which succeed. In all this there is per-
fect harmony; and it is upon the established connections and
coincidences of these events, which have been observed from time
immemorial to be absolute, or so nearly absolute and uniform in
their relations and results, that they have come to be recognized
as laws of our being, alike in the physical, social and moral world. It
is upon these familiar and elementary principles, that the evidence
of collateral facts and circumstances is received for the considera-
tion of the jury, from which, if satisfactorily proved, they may
infer the existence of the principal fact in controversy. Of course,
the accuracy of the conclusions drawn from the facts and circum-
stances given in evidence, will depend on the amount of knowledge,
and the extent of observation and experience of the persons, or
jurors, who are called upon to exercise this function, but every per-
son of common intelligence who has attained to years of discretion,
is so familiar with the natural connection and course of events in all
the ordinary affairs and transactions of life, that he is able to draw
correct and reliable conclusions almost instinctively, in relation to
questions of this character.

Gentlemen, you are to bring your own good sense and personal
experience to bear in the determination of the question at issue,
whether the defendant had any personal connection with this trans-
action. You are to carefully collate all the facts and circumstances
which have been proved to your satisfaction, and then to draw your
inferences from the known usual connection and relation between

such facts and circumstances and the guilt of the defendant, who is the person supposed to be implicated. You cannot be too careful and cautious in considering these circumstances and drawing your inferences; and it is your . duty to consider the evidence in every aspect in which it may be presented to your mind; to consider it conscientiously from the points of view presented both by the prisoner and the prosecution. You should not be influenced in your deliberations by mere public clamor on the one side or the other, or by the appeals of sympathy for the accused, but confine yourselves to a rigid scrutiny and consideration of the evidence in the case. And if, after such consideration, you find that the evidence is consistent with the theory of the defendant's innocence, you should not hesitate to acquit him.

The prosecution must prove their case ; must convince and satisfy you beyond a reasonable doubt, by legal evidence, of the guilt of the defendant, or he is entitled to an acquittal. But this doubt, gentlemen, should be in fact a reasonable doubt, not a mere quibble or excuse, resorted to as a method of escape from the performance of an important duty. When the prosecution has arrayed before you, evidence, either positive or circumstantial, which satisfies your minds and convinces your judgments of the truth of the charge, all considerations of personal sympathy for the accused must be dismissed, and a verdict of conviction should be rendered, with the same unhesitating firmness and alacrity, with which in a proper case you would render a verdict of acquittal. The people have rights to be respected and recognized as well as the prisoner, and when the guilt of the accused has been satisfactorily proved, the prosecution have a right to expect a firm and unhesitating discharge of duty by the court and jury, and a rigorous enforcement of the laws which have been adopted for the protection and safety of society. A crime committed in the dark and secret recesses of the midnight hour, far beyond all human knowledge or observation at the time, may afterward be discovered, and the guilty perpetrator be identified so clearly by surrounding and connecting circumstances, that we can view the entire original scene in all its stages as distinctly and unerringly as if it had occurred in our personal presence.

Now, it is insisted on behalf of the prosecution, that they have

shown this defendant, an entire stranger, coming to Elmira with no ostensible business, and remaining here under circumstances, in the house on the corner of Third and Baldwin streets, which naturally aroused suspicion. That from about the time of his first arrival, he was frequently, during the day and evening, seen in and about the opera house building, in which are the rooms of the bank and the association. That he was about the building when the discovery of the excavation was made, and was observed in the street in front of the main entrance in an excited condition, just previous to his arrest. That the tools found in the excavation over the vault, and in the various parcels in and about the lumber yard near the house, were the implements of burglars, and portions of the same kit, and all together constituted one complete kit or set of tools after the most improved and latest paterns, for breaking and entering iron safes. That the amount of furniture and provisions purchased for the use and consumption in the house, with other items of evidence in that connection, clearly indicate the sojourn there for a considerable time previous to the fifth of December, of several other persons besides the prisoner, who, for some reason which should have been explained, if an explanation were possible, kept themselves from public view. That the excavation made over the vault in the manner described, required the joint efforts and labor of several persons for several days, or even weeks, before it could have been accomplished. That the gloves found in the excavation, and those found in the house, had both, from their appearance, been used in the kind of labor required in drilling, loosening and removing the stone, brick and mortar from the wall to the places where they were deposited. That there were burdock weeds in the yard in the rear of the building, and in the immediate spot where a portion of the debris was thrown, having burs on them, and there were also burdock burs found upon the clothes left in the house of the defendant. That there were pieces of a newspaper, the first edition of the Elmira Gazette, of the fifth of December, which was issued about two o'clock in the afternoon of the same day that the excavation was discovered and the defendant arrested, cut in a peculiar manner, and in a circular form, as it is supposed, for a lamp-shade found in the house of the defendant, and another piece of the same newspaper, and the same date,

exactly corresponding with one of the pieces found in the house, also found in one of the parcels of burglars' tools in the lumber yard, and wrapped up with them in another newspaper, the New York Herald of the fifth of December. That a cut in one of the flat-irons found in the house, corresponded exactly with the saws manufactured for cutting iron, found in the satchel in the lumber yard. That a basin nearly full of putty was also found in the house, from which a small portion had been taken out, and the amount thus extracted corresponded in amount with the putty found in the excavation, taken in connection with the fact that putty was a necessary article for use when the iron safe should be reached, in the efforts to blow it open. And that the wrapping-paper enclosing the smaller parcels of tools contained in the larger packages in the lumber yard and in the excavation, was of the same color and quality, and the labels upon them all in the same hand-writing.

These are some, and perhaps nearly all of the more prominent facts and circumstances which the prosecution claim to have proved by the testimony of witnesses during the trial, bearing upon the question of the defendant's personal connection with the commission of this crime, and you will determine whether those facts have been clearly established. There may be other items of proof of a similar character, to which I have not referred, which have been discussed by the counsel in their arguments, and which may occur to you as pertinent and material in the consideration of the question of the defendant's guilt or innocence. If you find that these facts, or any portion of them, have been clearly proved, then you will consider their weight, relevancy and importance, in determining the principal fact of the defendant's connection with the crime, which they are introduced in evidence to establish.

You will determine whether these facts are consistent with the theory of the defendant's innocence, or whether they prove, or tend to prove, his guilty connection with the crime. You will consider each of these items of proof separately and apart from the others, and then consider them connected and combined together, and thus determine their weight, and arrive at a final conclusion.

As an illustration of my meaning, you will consider the facts, if you find them clearly proved, that the three different parcels of tools found in the excavation over the vault and in the lumber

yard near the house, were each a part of one complete set or kit of burglars' tools, and that the piece of paper of the Elmira Gazette found in one of the parcels of tools, exactly corresponded with another piece of the same newspaper, and cut in precisely the same form, found in the house of the defendant; and also that the saws for cutting iron, found in one of the parcels of the lumber yard, exactly fitted the cut made in the flat-iron found in the house.

Now, are these facts and circumstances, assuming them to be proved, consistent with the innocence of the defendant, or do they show or tend to show that the defendant, who was the responsible occupant of the house, had some connection with the excavation which had been made over the vault of the bank by some person or persons, with a part of the same tools? If they do tend in the latter direction, then is such an inference strengthened and corroborated by either or all of the facts and circumstances which have been alluded to and proved to your satisfaction?

In this manner you are to consider all the items of evidence which have been introduced in the course of the trial on the part of the prosecution, as well as all the evidence introduced on the part of the defendant, and then determine the question at issue— was the defendant guilty of committing or of participating in the commission of this crime? This is a question of fact exclusively for you to determine upon all the evidence. Upon you alone must devolve the whole responsibility of deciding this case. The duty of the court has been performed when we have called your attention to the legal principles, in the light of which you are to determine the facts; and with the performance of this duty, as we understand it, we leave you to perform as you understand it, not doubting that you will earnestly and honestly endeavor to render a verdict in accordance with the evidence, and mete out equal and exact justice to the people and the prisoner.

The counsel for the prisoner then requested the court to charge the jury as follows:

That the evidence must be of such a character as to exclude to a moral certainty every other hypothesis than that of guilt, before they can render a verdict of guilty.

The court declined to charge on that subject, except as he had already charged.

Prisoner's counsel duly excepted.

The prisoner's counsel also duly excepted to such portions of the evidence offered, and to such parts of the charge, as are printed in italics ; all the evidence offered was admitted in evidence.

The defendant asked the court to hold and decide :

1st. That the indictment so-called, and upon which the defendant has so far been tried, in the shape and form in which the same was at the commencement of the trial, was not a record from the Court of Sessions, in which it is claimed to have been found, and that what has been added to it since the entering upon the trial by the clerk, does not aid it.

The court refused to so hold or decide, and the defendant duly excepted.

2d. That upon the statement of the district attorney, and proof given as well on the part of the people as on the part of the defendant without objection, it appears that the indictment was not ordered by the Court of Sessions to this court for trial. Also, that what is claimed as amounting to such order, is not evidence of an order entered in the minutes of said Court of Sessions, as required and provided by statute.

The court refused to so hold or decide, and the prisoner duly excepted.

And hence the defendant asked that the trial of the cause be arrested, and the defendant be remanded. If the trial should not be arrested for the cause aforesaid, then the defendant asked the court to hold and decide :

1st. That the rules and principles of the common law as to the crime of burglary, still prevail, except in so far as abrogated or changed by the statutes. That one of such rules and principles is, that the breaking must be alleged and proved to have been with an intent to commit a felony. That the Revised Statutes and the act of the Legislature of April 29th, 1863, amending the same, defining the crime of burglary in the third degree, do not change the rule that the intent with which the breaking is to be charged and proved must be felonious.

In other words, that such statutes in using the words, " with intent to steal therein, or to commit any felony," do not warrant a conviction upon a charge of burglary in any of the buildings men-

tioned, with an intent to steal property in value less than twenty-five dollars.

And, therefore, there can be no conviction upon any of the counts of the indictment, which do not allege any intent to steal property in value greater than twenty-five dollars; and hence, for such reason, there can be no conviction under the first or fourth counts of the indictment.

2d. That in charging the intent to steal, there must be some description of the property which it is charged the defendant intended to steal; and hence each count, in the omission of any description, is defective, and proof of the property in the building or buildings into which the breaking is charged to have been, was inadmissible in evidence upon defendant's objection; and such objection having been taken upon the proof being offered, it should be stricken out; and the defendant moves that the same be now stricken out, and thereupon asks that the court hold that no conviction can be had.

3d. That upon the proof, no breaking into the building of the Second National Bank has been established, and hence there can be no conviction under the first and second counts of the indictment.

4th. That there can be no conviction under the third count of the indictment, because—

1st. There has been no incorporation shown of the Young Men's Christian Association.

2d. There has been no sufficient proof of any breaking into the room in such count mentioned.

3d. The allegation of the intent to commit a felony in such room, is not sufficient or sustained.

5th. There can be no conviction under the fourth count.

1st. There is no sufficient proof to show defendant aiding, etc., as charged.

2d. If the court holds there was an actual breaking into the bank, the attempt was consummated.

To the refusal of the court to so hold and decide upon each of said propositions, the prisoner duly excepted; upon each of the said propositions, the said court ruled separately, and the defendant excepted in the same manner.

The jury found a verdict of guilty, under the first three counts of the indictment, and the prisoner was sentenced by the court to hard labor in the State prison for five years.

*W. L. Dailey,* District Attorney, and *John Murdock,* for the people.

*Hart & McGuire,* for the prisoner.

BOCKES, J.:

It may well be claimed, I think, that the Court of Oyer and Terminer had jurisdiction to try the prisoner, without any order from the Court of Sessions, sending the indictment to the former court for trial. It is supposed that the right to hear and determine all crimes triable in the county, and of general jail delivery, given by the statute to courts of Oyer and Terminer, is abundant to confer jurisdiction on that court to try indictments found at the sessions, without any order from the latter court.* In two of the cases cited, the powers of the Court of Oyer and Terminer are elaborately discussed. In *The People* v. *Gay,* SUTHERLAND, J., remarks as follows : " It is correctly observed by the counsel for the People, that their power of general jail delivery, conferred by the statutes, must be considered at least as ample and comprehensive, as that conferred upon the justices of assize at common law, by their special commission to deliver the jails ; " and he adds, that in relation to them, " it seems to be well settled, that they may. try indictments found before other courts, as well as those found before themselves, when the prisoners are in jail." So in *The People* v. *The Judges of Dutchess Oyer and Terminer,* STRONG, J., says : " Their statutory powers are identical with those expressed in the commissions to similar tribunals in England." And in *The People* v. *The Gen. Sess. of N. Y.,* the same learned judge remarks, as follows: " The indictment against the relator was found and presented at the general sessions, * * * and was triable before the Oyer and Terminer, whether sent there by the sessions, or

* 2 R. S., 205, sec. 29 ; The People v. Gay, 10 Wend., 509; The People v. The Gen. Sess. of N. Y., 3 Barb., 144; The People v. The Judges of Dutchess Oyer and Terminer, 2 id., 282; Quimbo Appo v. The People, 20 N. Y., 531, 543, *et seq.*)

removed by an order of a justice of this court, or county judge, *or without either.*" In *Quinbo Appo* v. *The People,* SELDEN, J., in speaking of the commission of gaol delivery, says, that it conferred authority upon the commissioners, "to deliver the gaol of all prisoners found therein upon their arrival at the place where the court is held, and by virtue of this power they try all indictments, whatever the offense or wherever found." * But I do not deem it necessary to hold in this case, that the Court of Oyer and Terminer had authority to try the prisoner, without the order of the Court of Sessions sending it to the former court for trial. With such order, the authority of the court is not questioned. The statute expressly declares that the Court of Oyer and Terminer and jail delivery, shall have power to try all indictments found in the Court of Sessions of the same county, which shall have been sent by order of such Court of Sessions to, and received by, the Court of Oyer and Terminer. † In this case, such order was, as I think, shown to have been granted, and duly entered in the records of the court. When the question as regards the existence of the order, was raised, the record showed that such order had been made by the Court of Sessions: 1st. By an indorsement on the indictment; and 2d. By an order entered in the minutes kept by the clerk of that court. These entries may have been informal, but they were good in substance to show the order of the court, to the effect that the indictment should go to the Oyer and Terminer. Such is their plain import; and, as presented by the entries themselves, they appeared as the record of the Court of Sessions, made by its duly constituted officer. Nor was the record at all impugned by the oral proof, granting that it might be thus impugned. As regards the indorsement on the indictment, the clerk testified that it was made at the time the prisoner was arraigned, and entered his plea, and that it was in compliance with the direction of the court; and, as regards the order in the clerk's minutes, he testified that, although he actually made the entry of it at the opening of the trial in the Court of Oyer and Terminer, yet it was pursuant to the direction of the Court of Sessions, and it was entered in the blank left in the minutes therefor.

* See, also, 1 Chit. Crim. Law, 142, 143 ; 4 Blac. Com., 270.
† 2 R. S., 205, sec. 30.

I am of the opinion that the direction of the Court of Sessions, evidenced by the indorsement on the indictment, was a substantial compliance with the statute authorizing that court to send the indictment to the Court of Oyer and Terminer, and empowered the latter court to try the prisoner thereon. There is no statute declaring how the minutes of the proceedings shall be kept. The indictment, with the prisoner's plea of not guilty thereon, was a record in that court, and the entry indorsed in conformity with the direction of the court, became part of such record. All were kept and filed together. They became and were the record of the court, as to the proceedings in the court against the prisoner for the crime with which he was charged; and together they must stand for what they import.

But let the entry on the indictment be disregarded and go for naught, and it then appeared that the indictment was sent by the order of the Court of Sessions to the Oyer and Terminer. This appeared from the entry in the minutes of the clerk of that court. True, the order was not actually entered during the sitting of the court, and in its presence, but, superadded to the legal presumption afforded by the order itself on its production duly entered by the proper officer, to the effect that it was directed by the court when in session, we have the uncontradicted testimony of the clerk, in verification of the fact. It was not necessary to its validity, that the order or direction of the court should have been actually entered during its session. It was sufficient, if the facts as they really existed authorized the entry.*

It is a well settled rule, applicable as well to criminal cases as to civil, that a party cannot be heard to complain on account of the mere omission of the clerk, when a substantial right is not involved; and especially is this so, when the formal omission may be instantly supplied. Here the judicial act had been performed. The decision of the court had been declared. Its direction had been given, and the entry or recording of the decision and direction, was but a ministerial duty devolving on the clerk. So, as was said in substance in one of the cases cited, the formal entry of the order or

* 12 East, 67, *et seq.;* 1 East, 186 ; 6 Hill, 38; 3 Wend., 314, 319.

direction of the court as actually declared, could be made at any time when necessary for the purpose of evidence.

The considerations above suggested, lead to the conclusion that the indictment in this case was properly in the court of Oyer and Terminer, and that it was competent for that court to try the prisoner thereon.

It is next urged that the indictment was without a caption. The answer to this objection, stated by the counsel for the people, is complete; that the caption formed no part of the indictment, and could be affixed by the clerk, at any time, with a view to the perfecting of the record.

While the indictment remained in the Sessions, a caption was unnecessary, and it only became requisite on its removal to the Oyer. The affixing of the caption was important, only, to show the history of the proceedings against the prisoner. The prefixing or attaching of it was but a ministerial act, and it was well performed by the clerk in this case, if indeed, its omission could be urged against proceeding with the trial in the Oyer and Terminer.

We are now brought to a consideration of the case on the evidence, and on the exceptions taken to the judge's charge, and to his refusal to charge as requested.

The evidence on which the prisoner was convicted, was, as it seems, purely and entirely circumstantial. It is not before us in detail. Portions of it only are given, with a view to present the questions intended to be raised by the exceptions. But as to most of the facts and circumstances, it is stated simply in the case before us, that evidence was given showing their existence, or tending to their establishment before the jury.

As regards those facts and circumstances, in so far as they are material and necessary to support the verdict of the jury, we must hold them to have been satisfactorily proved.

The case is a remarkable one, resting as it does on a great number of circumstances, many of them apparently insignificant when considered as isolated facts, but when arranged in logical order, and applied to the prisoner, with the view of determining his motives and designs, they form a basis for probabilities leaving no reasonable doubt of his guilt. Certainly, the fair deductions from the proof were decidedly against him. The discovery of the imple-

ments with which the burglary was evidently attempted, and the proof tending to connect the prisoner with their possession, attempted concealment and use, afforded matters of just and fair consideration for the jury, and their conclusion must be accepted as the truth of the case.

It is supposed by the prisoner's counsel, that some facts admitted in evidence were of questionable character, as circumstances pointing to the complicity of the prisoner with the criminal act charged, but I find none so remote and irrelevant as to have demanded their exclusion.    The exhibition of the tools before the jury was proper, as the case stood on the facts disclosed ;* so also was the introduction of the newspaper found with them; as was also the fact of the prisoner's flight from jail, although this latter circumstance, while admissible, was of little significance in this case.

Nor was there any ground for exception to the charge of the judge, or in his refusal to charge as requested.

I think the remarks of the learned judge to the jury eminently fair on the facts, and sound in law.    He stated, in explicit terms, that the prosecution was bound to prove the case against the prisoner ; that if, after careful consideration of the case, they found that the evidence was consistent with the theory of defendant's innocence, they should not hesitate to acquit him ; that unless they were satisfied of his guilt, beyond a reasonable doubt, on legal evidence, he was entitled to an acquittal.    This was equivalent to a charge, as requested, that the evidence must be of such a character, as to exclude to a moral certainty every other hypothesis than that of guilt.    The learned judge said explicitly, that if they found that the evidence was consistent with the defendant's innocence, they should acquit him; that they should be satisfied of his guilt beyond a reasonable doubt, or he was entitled to an acquittal. This the judge was not bound to repeat, even in different language.    Having fully and correctly stated the law on the subject, it was not error to decline further to remark thereon.

Many other exceptions were interposed, but none of them are deemed to present any ground of error; nor are they considered of such importance as to require particular comment.

* 7 N. Y., 445; 30 id., 372 ; 35 id., 491.

We are of the opinion that the record discloses no error, and that the conviction and judgment should be affirmed.

Present—MILLER, P. J., BOOKES and BOARDMAN, JJ.

Conviction and judgment affirmed.